UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Dixon O'Brien, et al.<br><br>　　　Plaintiff,<br><br>　　v.<br><br>Village of Lincolnshire, et al.<br><br>　　　Defendant. | Case No. 18-cv-01310<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Dixon O'Brien, John Cook, the International Union of Operating Engineers, Local 150, AFL-CIO ("Local 150"), and the Chicago Regional Council of Carpenters, United Brotherhood of Carpenters and Joiners of America ("Carpenters") (collectively "the Unions"), have sued Defendants the Village of Lincolnshire and the Illinois Municipal League ("IML"). In their Third Amended Complaint (TAC) Plaintiffs bring five claims against Defendants, asserting that Defendants violated: (1) their First Amendment free speech and freedom of association rights through 42 U.S.C. § 1983 (Counts I and II, respectively); (2) the equal protection clause through 42 U.S.C. § 1983 (Count III); and (3) Illinois statutory law by engaging in *ultra vires* activity (Counts IV and V). [40].

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants have jointly moved, for the first time, to dismiss all these claims as well as Plaintiffs' related requests for declaratory and injunctive relief. [50]. For the following reasons, this Court grants Defendants' motion.

1

I.      **Legal Standard**

Under both Rules 12(b)(1) and 12(b)(6), this Court must construe the TAC [40] in the light most favorable to Plaintiffs, accept as true all well-pleaded facts, and draw reasonable inferences in their favor. *Yeftich v. Navistar, Inc.*, 772 F.3d 911, 915 (7th Cir. 2013); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). Statements of law, however, need not be accepted as true. *Id.* Rule 12(b)(6) limits this Court's consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

To survive Defendants' motion under Rule 12(b)(6), the TAC must "state a claim to the relief that is plausible on its face." *Yeftich*, 722 F.3d at 915. A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Turning to Rule 12(b)(1), there are two types of Rule 12(b)(1) challenges—factual and facial—and they have a "critical difference." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). When a defendant argues that "the plaintiff's complaints, even if true, were purportedly insufficient to establish injury-in-fact," the challenge is a facial one. *Id.* at 443–44. Facial challenges "require only that the court look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Id.* at 443. Factual challenges, however, lie

where "the complaint is formally sufficient, but the contention is that there is *in fact* no subject matter jurisdiction." *Id*. at 444 (internal quotations omitted). Courts may look beyond the complaint only when a defendant brings a factual attack against jurisdiction. *Id*.

Here, while Defendants articulate the legal standard for raising a factual question concerning jurisdiction, [51] at 2, they argue that the TAC's allegations, "when taken as true . . . do not support federal standing." *Id*. at 5. Defendants allege no external facts to call this Court's jurisdiction into question. *See generally* [51]; *Apex*, 572 F.3d at 444. Thus, Defendants bring a facial 12(b)(1) challenge, which requires this Court to look only to the complaint to determine if Plaintiffs have sufficiently alleged a basis for subject matter jurisdiction. *Apex*, 572 F.3d at 443.

## II. The Complaint's Allegations

The following facts come from Plaintiffs' TAC. [40]. Plaintiffs O'Brien and Cook reside in Lincolnshire and pay a variety of municipal taxes to the Village, including property taxes and sales taxes. *Id*. ¶¶ 7, 8.[1] Plaintiff Local 150 is a "labor organization" under federal law. *Id*. ¶ 9. It negotiates and administers collective bargaining agreements, which cover the work performed by employees within Lincolnshire. *Id*. Local 150 represents several individual residents of Lincolnshire

---

[1] On December 4, 2018, the parties filed a joint memorandum to address the fact that Plaintiff O'Brien moved outside of Lincolnshire after filing the TAC on June 19, 2018. [82] at 1. Specifically, O'Brien moved outside of Lincolnshire village limits on August 29, 2018. *Id*. The parties do not dispute, however, that O'Brien was a resident taxpayer at the time the alleged injuries occurred. *See generally id*. And as discussed below, this Court finds that O'Brien, as a resident taxpayer, has standing to bring suit against Defendants. Thus, this Court finds that O'Brien's recent change in residence does not affect standing for purposes of the motion to dismiss. The parties do, however, dispute how O'Brien's move affects subsequent discovery requests and injunctive relief. *See id*. But, because this Court grants Defendants' motion to dismiss, [50], it does not need to address these arguments.

3

as well as employees who work in the Village. *Id.* Plaintiff Carpenters is similarly a "labor organization" under federal law. *Id.* ¶ 11. One of its affiliates is Carpenters Local 250, which negotiates and administers collective bargaining agreements covering the work performed by employees within Lincolnshire. *Id.* Carpenters represent at least one employee who resides in Lincolnshire, as well as employees who work in the Village. *Id.* O'Brien is a member of Local 150, while Cook is a member of Carpenters Local 250. *Id.* ¶¶ 7, 8.

The Village Board of Trustees and Mayor comprise the corporate authority for Lincolnshire—six Trustees and the Mayor sit on the Village Board. *Id.* ¶ 14. Under Illinois law, the "corporate authority of each municipality may provide for joining the municipality in membership in the Illinois Municipal League." *Id.* ¶ 15; 65 ILCS § 5/1-8-1. Illinois law describes the IML as "an unincorporated, nonprofit, nonpolitical association of Illinois cities, villages and incorporated towns" and states that each municipality "may provide for the payment of annual membership dues and fees" to the IML. *Id.*

The IML contains over 1,000 Illinois municipalities as members. [40] ¶ 20. It collects dues from each of its member municipalities and charges dues payments based upon each municipality's population. *Id.* ¶ 21; [40-1] at 3. Lincolnshire pays its dues and other fees to the IML from its general tax revenue. [40] ¶¶ 23−24. Specifically, Plaintiffs allege that Lincolnshire pays dues and other fees to the IML out of its General Fund, the revenue of which comes from a variety of taxes, including utilities taxes, sales taxes, and income taxes. *Id.* ¶¶ 25−26. Between January 1,

4

2013, and February 12, 2018, Plaintiffs claim Lincolnshire paid the IML at least $5,051.00 in dues and fees. *Id*. ¶ 27.

Plaintiffs allege that although Illinois law describes the IML as a "nonprofit, nonpolitical association," the IML has engaged in targeted lobbying and "other political activities," including making political contributions, that exceed its statutorily authorized purpose. 65 ILCS § 5/1-8-1; [40] ¶¶ 29−36. For example, Plaintiffs allege that the IML advertises its lobbying efforts, as well as its annual "Lobby Day" in Springfield. *Id*. ¶ 29; [40-2]. Plaintiffs also point to an e-mail that the IML sent in March 2015 as evidence of impermissible political activities; in the e-mail, the IML allegedly urged Illinois units of government to support Illinois Governor Bruce Rauner's "Turnaround Agenda" by adopting local ordinances that would legalize local "right-to-work" zones. [40] ¶¶ 30−33. Specifically, Plaintiffs allege that the IML acknowledged its correspondence with the Governor's office with these words:

> The Governor's office has asked that we follow-up with mayors and managers on the Turnaround Agenda information and provide a resolution . . . that is supportive of his administration's effort to address collective bargaining, unfunded mandates, prevailing wage requirements, workers' compensation costs and legal empowerment zones, among other things noted in the attachment . . .[i]f you do adopt it locally, please send me a copy electronically . . . and mail me a copy to the Governor's office . . . .

*Id*. ¶ 32. Lincolnshire remains the only local government unit in the state to adopt such a "right-to-work" zone. *Id*. ¶ 34; *see also Intern. Union of Operating Eng'rs Local 399 v. Lincolnshire*, Nos. 17-300 & 17-1325, 2018 WL 4655487 (7th Cir. Sept. 28, 2018) (striking Lincolnshire's right-to-work ordinance).

5

Because O'Brien and Cook pay taxes as residents of Lincolnshire, a portion of their tax money goes to Lincolnshire's IML membership dues. [40] ¶ 37. Both O'Brien and Cook object to the use of their tax money to fund the IML's alleged lobbying and political activities, which they assert run "directly against their economic interests and political beliefs." *Id.* ¶ 38. In January of 2018, O'Brien sent a letter to Lincolnshire Mayor Elizabeth Brandt formally requesting a refund of his portion of tax money that funded any lobbying or other political activities, "including but not limited to his share of dues paid to the IML." *Id.* ¶ 39. Neither Mayor Brandt nor any agent of Lincolnshire has responded to O'Brien's demand to date. *Id.* ¶ 40.

### III. Analysis

#### 1. Article III Standing

Defendants seek dismissal under Rule 12(b)(1) for lack of Article III standing and under Rule 12(b)(6) for failure to state a claim. Because standing is jurisdictional, this Court must consider that issue before reaching the merits. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999); *Hinrichs v. Speaker of House of Representatives of Ind. Gen. Assembly*, 506 F. Supp. 3d 584, 590 (7th Cir. 2007); *Halperin v. Intern. Web Servs., LLC*, 70 F. Supp. 3d 893, 897 (N.D. Ill. 2014).

Article III of the Constitution limits "federal judicial power to certain 'cases' and 'controversies.'" *Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)). To establish Article III standing in this case, a plaintiff must show that: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

6

hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Silha*, 807 F.3d at 173 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Lujan*, 504 U.S. at 560–61. The party invoking federal jurisdiction bears the burden of establishing the elements of Article III standing. *Lujan*, 504 U.S. at 561.

Here, the parties dispute only whether Plaintiffs have alleged an "injury in fact" sufficient to establish Article III standing.

### A. Plaintiffs Have Established Article III Standing

Plaintiffs allege standing based upon their status as resident, municipal taxpayers. *See* [40] ¶¶ 10, 12.[2] Defendants, on the other hand, rely primarily upon the Supreme Court's decision in *Doremus v. Board of Education*, 342 U.S. 429 (1952), for the proposition that Plaintiffs do not have Article III standing to pursue their First Amendment claims. [51] at 3–5. Specifically, they cite the following excerpt from *Doremus* as controlling:

> Without disparaging the availability of the remedy by taxpayer's action to restrain unconstitutional acts which result in direct pecuniary injury, we reiterate what the Court said of a federal statute as equally true

---

[2] Unlike Plaintiffs O'Brien and Cook, the Unions bring suit as representatives of municipal taxpayers. An organization has associational standing if: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017); *United Food & Commer. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996). Here, the first two prongs are easily met, as O'Brien and Cook are members of the Unions, and right-to-work zones directly implicate Unions. Similarly, the third prong is met where, as here, "the organization seeking standing is joined in suit with its members who have Article III standing." *Flynn*, 863 F.3d at 640. This Court "need not weigh whether the relief requested requires the participation of individual members" because this Court finds that "the individual members are joined and standing has been met." *Id*. Thus, the Unions have satisfied the associational standing requirement.

7

when a state Act is assailed: "The party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

342 U.S. at 434 (quoting *Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923)); [51] at 3. Thus, Defendants argue that like federal and state taxpayers, Plaintiffs must show they have sustained a direct injury, rather than an injury that affects all Village residents. [51] at 3. This argument fails for several reasons.

First, Defendants' argument would require this Court to part with the well-settled principle that "the interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." *Hinrichs*, 506 F.3d at 592 (quoting *Frothingham*, 262 U.S. at 486−87). The interest of "federal taxpayers with respect to the federal treasury [is] 'very different' from that of a municipal taxpayer challenging an allegedly illegal use of municipal funds." *TinleySparks, Inc. v. Vill. of Tinley Park*, 181 F. Supp. 3d 548 (N.D. Ill. 2015) (quoting *Hinrichs*, 506 F.3d at 591−92)); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349 (2006) ("The *Frothingham* Court noted with approval the standing of municipal residents to enjoin the 'illegal use of the moneys of a municipal corporation,' relying on 'the peculiar relation of the corporate taxpayer to the corporation' to distinguish such a case from the general bar on taxpayer suits.") (quoting *Frothingham*, 262 U.S. at 487).

Defendants argue that *Doremus* trumps the Court's decision in *Frothingham*

8

and "applies with equal force to Plaintiffs' standing in this Court against the Village," [51] at 4. But the passage Defendants cite in *Doremus* described federal and *state* taxpayer standing, rather than municipal standing. *See, e.g., Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 600–01 (2007) (explaining that in *Doremus*, the Court "rejected a *state* taxpayer's claim of standing to challenge a state law authorizing public school teachers to read from the Bible") (emphasis added); *DaimlerChrysler Corp.*, 547 U.S. at 345 (2006) ("The foregoing rationale for rejecting federal taxpayer standing applies with undiminished force to state taxpayers. We indicated as much in *Doremus*"); *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197 (6th Cir. 2011) (finding plaintiffs met the injury element of standing as municipal taxpayers because the Court, in *Doremus*, "did not lay down any rules about *municipal*-taxpayer suits, and has repeatedly construed *Doremus* as a state-taxpayer case."); *United States v. City of New York*, 972 F.2d 464, 471 (2d Cir. 1992) (noting that *Doremus* involved state taxpayers and finding nothing in that case "to convince us that *Frothingham*'s view of municipal taxpayer standing is not still good law") (citing *Frothingham v. Mellon*, decided with *Massachusetts v. Mellon*, 262 U.S. 447 (1923)).

Moreover, the Seventh Circuit has explicitly ruled that "municipal taxpayer challenges to municipal actions . . . are not subject to the same stringent standing requirements as state and federal taxpayers seeking to challenge state and federal actions, respectively." *Hinrichs*, 506 F.3d at 600 n.9. Defendants argue that this statement is "dicta" and "not supported precedent, based upon *Doremus*." [54] at 3.

9

But, as discussed above, this language clearly states the municipal taxpayer standing doctrine first articulated in *Frothingham*.

Finally, the Seventh Circuit has clarified what municipal taxpayers must allege to establish Article III standing. In doing so, the Seventh Circuit did cite *Doremus*, but solely for the principle that "municipal taxpayers have standing to bring claims against municipalities only when they bring 'a good-faith pocketbook action.'" *Clay v. Fort Wayne Cmty. Sch.*, 76 F.3d 873, 879 (7th Cir. 1996) (citing *Doremus*, 342 U.S. at 434). And in explaining what it meant by "a good-faith pocketbook action," the Seventh Circuit clarified that "municipal taxpayers have standing when they object to a disbursement of funds occasioned solely by the alleged unconstitutional conduct." *Clay*, 76 F.3d at 879. In other words, municipal taxpayer status "does not confer standing absent some allegation by the plaintiffs of an illegal use of tax revenues." *Id.* Here, Plaintiffs have met this showing of standing by alleging that Defendants unconstitutionally spent their municipal tax revenues. *See generally* [40]. Therefore, Plaintiffs have alleged an injury-in-fact sufficient to establish Article III standing.

### 2. Plaintiffs' First Amendment Claims

Plaintiffs base their First Amendment claims upon the Supreme Court's recent decision in *Janus v. AFSCME Council 31*, 138 S. Ct. 2448 (2018). In *Janus*, the Court held that under the compelled-subsidy doctrine, an Illinois statute authorizing public-sector unions to assess "agency fees" violated nonmembers' free speech rights by compelling them to subsidize private speech with which they disagreed. 138 S. Ct.

10

at 2486. Here, Plaintiffs allege that under the compelled-subsidy doctrine, Defendants similarly compel Plaintiffs to subsidize the speech of a private entity—the IML—with which they disagree. [40] ¶ 49. In response, Defendants argue that both the Village and the IML engage in government speech, which remains protected from First Amendment scrutiny under the government speech doctrine. [51] at 5–7. Defendants thus distinguish *Janus*, arguing that the plaintiff there was compelled to pay an agency fee to a private entity, rather than taxes to a public body. *Id.* at 8. For the reasons explained below, this Court agrees with Defendants and finds that Lincolnshire and the IML engage in government speech not subject to First Amendment scrutiny. Thus, the compelled-subsidy doctrine does not apply.

### A. The Compelled-Subsidy & Government Speech Doctrines

The Supreme Court has sustained First Amendment challenges in "compelled-subsidy" cases, in which the government requires individuals to subsidize private messages with which they disagree. *See, e.g.*, *Janus*, 138 S. Ct. 2448; *United States v. United Foods*, 533 U.S. 405 (2001) (sustaining a compelled-subsidy challenge to an assessment, the only purpose of which was to fund mushroom advertising); *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990) (sustaining a compelled-subsidy challenge to state bar membership dues used to finance certain ideological and political activities that were not prescribed by law or developed under official government supervision).

The Court, however, has emphasized that compelled "support of government—even those programs of government one does not approve—is of course perfectly constitutional, as every taxpayer must attest." *Johanns v. Livestock Mktg. Ass'n*, 544

U.S. 550, 559 (2005). In other words, the government speech doctrine provides that citizens may challenge "compelled support of private speech, but have no First Amendment right not to fund government speech." *Id*. at 562; *see also Bd. of Regents v. Southworth*, 529 U.S. 217 (2000) ("The government, as a general rule, may support valid programs and policies by taxes or other exactions binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies."); *Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 806 (7th Cir. 2011) (explaining that *Johanns* holds that "even persons who are taxed to pay for governmental speech are not entitled to relief from the message (or the obligation to pay for it).").

This case thus turns upon whether Plaintiffs' claims challenge private or government speech. Plaintiffs argue that the IML is a private, third-party entity engaging in private speech. [53] at 7 ("[T]he speech to which Plaintiffs object is not government speech, but rather the speech of the IML, a private party."). Defendants argue that the IML is a public body engaging in government speech. [51] at 7−8.

### B. The Government Speech Doctrine Applies to the IML

The government speech doctrine is a relatively new, still-evolving doctrine. Justice Souter, for example, has described it as "still at an adolescent stage of imprecision." *Griswold v. Driscoll*, 616 F.3d 53, 59 n.6 (1st Cir. 2010). And while few cases have addressed the distinction between private associations and government for purposes of the government speech doctrine, a 2013 case involving "the intriguing

12

question of whether municipalities in the state of Maine may band together and spend taxpayer dollars to help defeat taxpayer initiatives" persuades this Court that the IML constitutes a government entity for the purposes of the government speech doctrine. *Adams v. Me. Mun. Ass'n*, No. 1:10-cv-00258-JAW, 2013 WL 9246553, at *1 (D. Me. Feb. 14, 2013).

In *Adams*, the Maine district court concluded that the government speech doctrine applied to a municipal association (MAA) because the association's speech "was effectively controlled by the government," per the Supreme Court's decision in *Johanns*. *Id.* at 23; *Johanns*, 544 U.S. at 562 (finding the fact that the government set the "overall message to be communicated" and approved "every word" weighed heavily in favor of government speech). Specifically, the court found that the following facts justified applying the government speech doctrine to the MAA: (1) the association was comprised of state municipalities; (2) nearly 100 percent of the state's municipalities were municipal members; and (3) the association's executive committee was comprised exclusively of municipal members, as was its legislative policy committee. *Adams*, 2013 WL 9246553, at *5. And while the *Adams* plaintiffs argued that the association could not be considered the instrumentality or agent of its members because not all of its members agreed with its policy positions, the court found this argument unpersuasive, because each member was "entitled to influence the association's policies through internal governance structures, and each member implicitly consent[ed] to be represented by the association simply by joining it." *Id.* at

13

*22. Moreover, "any municipality that wished to "terminate its membership in MMA based on a policy disagreement or for any other reason [was] free to do so." *Id.*

Here, as in *Adams*, the IML's speech is government speech. The IML exists as a statutorily authorized, unincorporated association comprised solely of elected officials acting on behalf of their municipalities. 65 ILCS § 5/1-8-1. The relevant Illinois statute explicitly says that the "member cities, villages, and incorporated towns" act "by, through and in the name of such instrumentality . . . for the purpose of improving local government." *Id.* In short, the text of the statute itself demonstrates that the IML is not a private entity, but instead a formal vehicle through which elected officials act together on behalf of their government entities. And like the MAA, the IML's Executive Committee and Legislative Committee are comprised exclusively of municipal members. [40-1] at 4–13.

Plaintiffs argue that not all municipalities approve of every IML position, making it similar to a private association. [53] at 9. But, as the court in *Adams* emphasized, each municipal member implicitly consented to the IML's representation and can terminate its membership based upon a policy disagreement. *Adams*, 2013 WL 9246553, at *22. As in any large government entity or organization, the association does not need unanimity on any given policy position to effectively advocate on behalf of its members. *Id.*

Plaintiffs fail to plead private involvement in any of the IML's decisions. *See generally* [40]. The organization's actions were entirely within municipal officials' control. 65 ILCS § 5/1-8-1; [40-1] at 4–13. Thus, the IML is not analogous to a private

14

entity subject to the compelled-subsidy doctrine, as in *Janus*, and the government speech doctrine applies.

### C. Defendants' Speech Does Not Warrant an Exception to the Government Speech Doctrine

This Court turns now to whether the specific speech at issue warrants an exception to the government speech doctrine. Plaintiffs argue that because the IML engaged in political speech, it exceeded its statutory authorization and therefore requires First Amendment scrutiny. [53] at 9. Specifically, Plaintiffs claim that "Lincolnshire's utilization of Plaintiffs' tax dollars to fund the IML's lobbying activities" is "not germane to a broader regulatory scheme," and thus it must be subject to the compelled-subsidy doctrine under *Keller*, which held that the State Bar of California could only "constitutionally fund activities germane to" its goals of "regulating the legal profession and improving the quality of legal services," 496 U.S. at 13–14. *Id*. at 10. Plaintiff's assertion of an exception to the government speech doctrine fails to withstand scrutiny.

After generally describing the IML as a "nonpolitical" association," the Illinois statute explicitly provides that member municipalities (like most local government entities) "may provide and disseminate information and research services," and "may do all other acts for the purposes of improving" local government. 65 ILCS § 5/1-8-1; *see also Ries v. City of Chicago*, 242 Ill.2d 205, 215–216 (Ill. 2011) (If [statutory] language is clear and unambiguous, we are not at liberty to depart from the language's plan meaning."). As such, the law permits the IML members to take public policy positions on, and disseminate information about, methods of improving local

government (including here, portions of the Governor's legislative agenda, supposedly designed to improve local government).[3] *See Page v. Lexington Cty. Sch. Dist.*, 531 F.3d 275, 287−88 (4th Cir. 2008) (concluding that the government speech doctrine applied in a case where a school district used its website, email, and other forms of communication to urge opposition to a bill proposing tax credits for private and home schooling); *Kidwell v. City of Union*, 462 F.3d 620, 625 (6th Cir. 2006) (declining to carve out an election-based exception to the government speech doctrine in a case where a city council spent public funds to oppose a series of ballot initiatives); *Adams*, 2013 WL 9246553 at *79 ("[I]t is undisputed that MMA's advocacy activities [lobbying against citizen initiatives to control or limit state and municipal taxes] related to initiatives that it perceived would have serious consequences for municipal governments").

In short, the operative complaint fails to allege unauthorized political speech for purposes of the compelled-subsidy doctrine. If the Village of Lincolnshire's residents disagree with its decision to join the IML based upon this activity, they can

---

[3] Plaintiffs' compelled-subsidy theory also claims in conclusory fashion that the IML "has made political contributions to candidates running for office and to public officials while sitting in office." [40] ¶¶ 35−36. The operative complaint, however, fails to provide any requisite details, and the only evidence referenced anywhere in the pleadings shows (without any dispute between the parties) that even though the IML did make monetary contributions to both Republican and Democrat campaign committees in the past, it stopped doing so after June 1, 2011—well outside of the 2-year statute of limitations period for constitutional claims brought under Section 1983 in Illinois. [54] at 9, 15−24 (Illinois State Board of Elections database search print-out detailing IML contribution history); [53] at 13 n.2 (plaintiff citing to same database search); *Manley v. City of Chicago*, 236 F.3d 392, 395 (7th Cir. 2001) ("[I]n Illinois, a two-year statute of limitations applies to claims brought under §§ 1983 and 1985."). Absent any reference to timely campaign contributions, this Court need not further examine Plaintiffs' conclusory allegation or otherwise address any distinction between campaign contributions and policy advocacy under the government speech doctrine. *Adams*, 2013 WL 9246553, at *22 ("This Court follows the Fourth and Sixth Circuits in declining to craft a bright line political or campaign speech exception to the government speech doctrine") (citing *Kidwell*, 462 F.3d at 625 and *Page*, 531 F.3d 275).

express this opinion at the ballot box, or limit the conduct of elected officials by law, regulation, or practice. *See, e.g.*, *Southworth*, 529 U.S. at 235 ("When the government speaks . . . it is, in the end, accountable to the electorate and the political process for its advocacy.").

This Court finds the IML's speech exempt from first Amendment scrutiny as government speech, and thus dismisses with prejudice Plaintiffs' First Amendment free speech and concomitant association claim (Counts I and II).

### 3. Plaintiffs' Equal Protection Claim

In addition to their First Amendment theory, Plaintiffs bring an equal protection claim. Specifically, Plaintiffs allege that because "under existing federal law, union members are able to object to and opt out of paying union dues spent on political causes with which they disagree," Lincolnshire "denies Plaintiffs equal protection of the law by compelling them to support political activities with which they disagree while allowing others to refuse to do so." *Id.* ¶¶ 51–53. Plaintiffs' equal protection claim thus remains dependent upon this Court finding that Lincolnshire unconstitutionally compelled them to support political activities with which they disagreed. But because Plaintiffs First Amendment claims fail for the reasons discussed above, they failed to establish that they are not legally required to pay their municipal taxes to Lincolnshire. Therefore, Plaintiffs' equal protection claim must also be dismissed with prejudice.

### 4. Plaintiffs' State Law Claims

The "general rule is that, when all federal-law claims are dismissed before trial," the pendent claims should be left to the state courts. *Wright v. Associated Insurance Cos. Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994). When determining how best to exercise its discretion regarding the application of this general rule, this Court considers "the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources," among other factors. *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994). Given that Plaintiffs' federal claims have been dismissed before trial, and the ease with which an Illinois court can address Plaintiffs' remaining state law claims, this Court declines to exercise its supplemental jurisdiction over their remaining state law claims (Counts IV and V).

## IV. Conclusion

For the reasons explained above, this Court grants Defendants' joint motion to dismiss with prejudice. [50]. All dates and deadlines are stricken. Civil case terminated.

Dated: December 7, 2018

Entered:

John Robert Blakey
United States District Judge